Filed 9/3/13  In re Lincoln M. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re LINCOLN M., a Person Coming Under the Juvenile Court Law. | B247636 (Los Angeles County Super. Ct. No. CK49156) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JENNIFER M., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Elizabeth Kim, Juvenile Court Referee.  Affirmed.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

Jennifer M. (Mother) has a long history of drug use and failed rehabilitations. As a result, her older children were permanently placed with other families. Last year, Mother's son Lincoln M. was born with methamphetamine in his bloodstream. Mother asks us to ignore her history and focus on the possibility of a brighter future. Like the juvenile court, we see evidence of changing circumstances, not changed circumstances. Mother's recently renewed effort to attain sobriety does not outweigh Lincoln's need for permanency. We affirm the orders denying Mother's petition for a modification and terminating her parental rights. (Welf. & Inst. Code, §§ 388, 366.26.)[1]

## FACTS

In 2002, the Department of Children and Family Services (DCFS) petitioned on behalf of Mother's daughters Valerie and C. The juvenile court found that Mother physically abused Valerie by striking her with a belt; Mother failed to protect the children by leaving them with their physically abusive grandmother; Mother made inappropriate plans for the children's care and supervision by leaving them with their abusive grandmother or a family friend, and allowing strangers to walk them home from school; Mother has a history of substance abuse that includes heroin, alcohol, methamphetamine (meth), and marijuana, and currently abuses drugs, rendering her incapable of providing regular child care; Mother created a detrimental and endangering home environment for the children by abusing drugs in their presence and having drugs and paraphernalia within access of the children; Mother endangered the children by driving them while under the influence of drugs; and Mother left the children without making plans for their return home or providing them with the necessities of life. The court terminated reunification services in July 2003. C. was adopted in 2005, and Valerie was permanently placed with nonrelated legal guardians.

In May 2012, DCFS was alerted that Mother's newborn child Lincoln tested positive for meth, as did Mother. When interviewed at the hospital, Mother claimed

---

[1] All statutory references in this opinion are to the Welfare and Institutions Code.

seven years of sobriety until she started "hanging out with the wrong crowd" in 2010, causing her to relapse. She admitted using meth two weeks before giving birth. Lincoln's father Ramon M. (Father) stated that he has a 14-year-old daughter from a prior relationship, but in 2004 he was convicted and served prison time for molesting her. Mother separated from Father in January 2012, "after he kicked the other woman they were having a threesome with out of the home." Father understood that DCFS would not release Lincoln into his custody because of his child abuse conviction. Mother and Father began dating in 2005 and were married in 2010.

Though Father denied awareness that Mother was currently abusing drugs, his sister, a nurse, warned him early in his relationship that Mother had the signs of a drug user. Mother acted irrationally and left the home for days at a time. The paternal aunt described Mother as "a manipulator that lies and twists words to make herself out as the victim." The paternal grandfather stated that Mother admitted to him three months earlier that she had used drugs, but stopped. He congratulated her for stopping and told her to be careful because she was pregnant.

Mr. and Mrs. M., the legal guardians of Mother's child Valerie, expressed willingness to have Lincoln placed in their home and adopt him if Mother fails to reunify. They have been caring for Valerie for three years and would welcome her sibling. Mrs. M. stated that Mother frequently lies: she has known Mother since high school, which is how she ended up as Valerie's guardian. Mother provided documentation that she was undergoing cancer treatment. Mother favored placing Lincoln with the M. family.

Based on Mother's drug history, her failure to reunify with two older children, Lincoln's positive screen for meth, and Father's child molestation conviction, DCFS detained Lincoln in hospital care. DCFS assessed the risk of future abuse and neglect as "very high." DCFS recommended that Mother complete an in-patient drug program with random testing, individual counseling, and parenting, with monitored visitation for both parents.

On June 4, 2012, DCFS filed a petition on behalf of Lincoln. It alleges that Lincoln was born with a positive toxicology screen for meth, and Mother tested positive

3

as well. Mother has a long history of substance abuse that renders her incapable of providing regular care, and her daughters received permanent placement services due to Mother's substance abuse. The petition also alleges that Father sexually abused Lincoln's sibling and is a registered sex offender with a conviction for lewd or lascivious acts with a child under the age of 14. Mother's drug abuse and Father's sexual abuse place Lincoln at risk of harm. The juvenile court found a prima facie case for detaining Lincoln from both parents.

DCFS submitted a jurisdiction/disposition report. Discussing Mother's prior history, DCFS noted that it received a referral that Mother left Valerie and C. for a month in day care and never returned to pick them up. Mother had gone to participate in a drug program to overcome use of marijuana and "speed." Mother's skin had needle marks and "lumps as a result of shooting meth."

In an interview, Mother admitted using meth two days before Lincoln was born, claiming that "prior to her relapse two days before delivery she had been clean since August 2005." Mother ascribed her relapse to marital discord with Father. Mother denied ever using heroin or alcohol, only marijuana and meth. Mother completed a drug treatment program in prison in 2005, but lost custody of her daughters due to her drug history. Mother used marijuana during her cancer treatment, but stopped when she found out she was pregnant. Her cancer is now in remission.

Mother indicated that she first used drugs at age 13. Initially, her usage was a few times weekly, but later escalated to daily use. Mother considers herself to be an addict, and is committed to completing a residential treatment program. She plans to attend 12-step meetings to maintain sobriety when the drug program ends. Mother asserted that her main goal is to regain custody of Lincoln and remain sober, saying "I'm a different person. I'm done doing [drugs]. I'm done going to jail." Mother's parents were heroin addicts. She was raised by her maternal aunt and grandmother.

Mother knows that Father is a registered sex offender but is unconcerned about it. After noting that Father participated in two years of counseling, she added, "'I think the whole thing got blown out of proportion. . . . From what his friends and family say

[Father] was holding his daughter and she had a dress on and he had his hands under her dress on her bottom. That was it. He thinks it was inappropriate, but from what it sounds like it wasn't.'" Mother is aware that Father admitted to police that he molested his daughter, but she does not believe that a molestation occurred.

For his part, Father learned of Mother's drug use while at the hospital visiting Lincoln. When a nurse informed him that Mother and Lincoln tested positive for meth, Mother told Father that "'the hospital made a mistake and that she did not use drugs.'" He could not believe that Mother used drugs while pregnant, but added that he did not understand how he could have molested his own daughter, either. He knew Mother had a history of substance abuse but she told him she had kicked the habit and was clean for six years. During their marriage, Mother would frequently leave and not return for long periods. He "just thought she was hanging out with her friends" during her weeks- or months-long absences. In January 2012, Mother left to go to church and never returned. She asked to come home shortly before Lincoln's birth in May 2012, but Father said no. During one of Mother's disappearances in 2011, she told him she had to be "clean" before she returned home. Father does not understand drug behavior or why Mother cannot just stop using drugs.

Father conceded that he molested his daughter by putting his hands beneath her underwear, but denied digital penetration. He completed twice the amount of required counseling to help himself understand his actions, which he found disturbing. At the time, Father was having an internal struggle regarding his sexual orientation and had difficulties in his relationship with the child's mother. He believes that the molestation was a way to get back at his wife, rather than sexual gratification. Father was sexually molested by a man in his neighborhood when he was a child. Father was honest and forthcoming about his conduct.

Mother visited Lincoln once a week for an hour, since June 6, 2012. Lincoln was brought by a monitor to see Mother at her treatment facility. Father also visited Lincoln once a week for an hour. Assessing the family's situation, the social worker expressed disbelief that Mother was clean for seven years before using meth while pregnant with

5

Lincoln. Father indicated that Mother disappeared in 2011, and told him she did not want to return home until she was clean; further, a mandated reporting party contacted DCFS in January 2011 to say that Mother was arrested when she was pulled over and found to have drugs in her possession. Mother continues to struggle with drug abuse and is presently in a residential program. DCFS asked that neither parent receive reunification services because Mother failed to reunify with two older children and Father is a registered sex offender.

Mother waived her right to a trial and submitted on the basis of the DCFS reports and other documents. Father requested a trial on the petition. Pending trial, DCFS reported in July 2012 that Mother actively participates in her treatment program. She tested negative for drugs on June 13, 2012, when she entered the program. She also tested negative on July 11, 2012.

DCFS noted that after Mother completed a substance abuse program while incarcerated in 2005, she participated in 12-step meetings several times per week. Mother was granted unmonitored and overnight visits with Valerie in 2006; however, in February 2008, Mother was restricted to monitored visits due to her anger management issues, conflict between her and Valerie, and Valerie's feelings that she was not safe with Mother. Four years later, Mother's contacts with Valerie continue to be monitored.

On July 24, 2012, the court sustained an allegation that Mother has a 13-year history of substance abuse and currently abuses meth, rendering her incapable of providing regular care for Lincoln. Both Mother and Lincoln tested positive for meth when the child was born. Mother's two daughters received permanent placement services due to Mother's drug abuse, which endangers Lincoln's health and safety and places him at risk of harm.

At a hearing on July 31, 2012, the court found that Lincoln is a two-month-old child whose parents have a history of child abuse. Mother physically abused her two daughters and abused drugs; as a result, Mother did not reunify with her children and one of them was adopted after Mother's parental rights were terminated. Father sexually abused his daughter when she was five years old, for which he was convicted in 2004. In

6

violation of the rules regarding registered sex offenders, Father spent time alone with Mother's daughter Valerie, resulting in a child abuse referral. The court sustained counts that Father sexually abused his daughter, is a registered sex offender, and his conduct places Lincoln at risk of harm. The court declared Lincoln a dependent of the juvenile court.

Moving to disposition, counsel and the court noted that Mother relapsed in 2010, after completing a required drug program in jail, and continued to use drugs until Lincoln was born in 2012. The parents are not requesting custody or even unmonitored contact with their newborn. At best, giving them reunification services merely postpones permanency for Lincoln, as the parents have never lived with the child and have no hope of obtaining custody in the foreseeable future. Over Mother's and Father's objections, the court denied reunification services and set a hearing to select a permanent plan.

In November 2012, Mother petitioned for a modification. As a changed circumstance, she cited completion of a 120-day inpatient drug program, 12 weeks of domestic violence classes, and an anger management course. She has enrolled in an outpatient aftercare program and has tested negative for drugs. Mother asked the court to give her custody of Lincoln, or reunification services and unmonitored visits. She consistently visits Lincoln and believes she has taken all necessary action to maintain a healthier lifestyle. It is in Lincoln's best interest to be with Mother "as it is always the goal to reunify families." The court scheduled a hearing on Mother's petition.

In November 2012, DCFS reported that Lincoln does not demonstrate developmental, behavioral or mental health problems. Mother and Father behave appropriately during monitored visits. DCFS identified Mr. and Mrs. M., the legal guardians of Lincoln's 17-year-old half sister Valerie, as prospective adoptive parents. The M.'s and Valerie have day visits with Lincoln. The court continued the permanent plan hearing to obtain a home study for the prospective adoptive family.

In January 2013, Lincoln's caregivers, Mr. and Mrs. W., requested that they become his adoptive parents if his natural parents fail to reunify with him. Lincoln is attached to the W. family. Lincoln's pediatrician is very happy with the child's

7

development throughout his placement with the W. family, saying that they "have taken excellent care of him." Lincoln has lived with the W.'s since he was five days old.

DCFS reported that Lincoln "appears to be happy, secure, bonded, expressive and well adjusted in his present family." Mother and Father have joint monitored two-hour visits weekly. Lincoln's half sister Valerie and her legal guardians had four unmonitored weekend visits with Lincoln; they had not seen Lincoln for the last six weeks. The current foster home—which is approved for adoption—continues to be the most suitable for Lincoln. He has received excellent care there for the full eight months of his life, and is being raised and loved like the W.'s own child. DCFS noted that Mother is currently the subject of an arrest warrant in Orange County on felony charges of second degree burglary and forgery.

Visitation notes from September to November 2012 indicate that Mother and Father have enjoyable visits. They feed and burp Lincoln, soothe him with a pacifier, change his diaper, say caring things and are attentive to his needs. Lincoln is happy to receive all the attention from adults. The M. family continued to be interested in adopting Lincoln, after caring for his half sister Valerie for four years. Valerie described the M.'s as "great parents" although she does not feel emotionally close to them.

DCFS responded to Mother's petition for a modification. It offered Mother's lengthy rap sheet, which includes a misdemeanor conviction for misappropriating property (2001); arrests for forgery, driving without a license and burglary (2003); a felony conviction for passing false checks (2003); a misdemeanor conviction for being under the influence of a controlled substance (2003); a felony conviction for an assortment of drug-related crimes, including the sale of drugs and being a felon in possession of a firearm (2004); a felony conviction for drug crimes such as possessing a controlled substance for sale and drug paraphernalia (2010); a misdemeanor conviction for possessing drug paraphernalia (2011); and felony convictions for being under the influence and possessing drugs (2011). In addition, Mother has a 1996 federal conviction for drug smuggling with the intent to distribute.

DCFS agreed that Mother completed a residential drug program, enrolled in an outpatient treatment program, and took domestic violence and anger management classes. She has submitted to drug testing. Mother has attended 42 AA/NA meetings since entering the program in October 2012. Mother was having difficulty finding work, due to her criminal history.

Mother and Father consistently visit every week and are appropriate during visits, feeding Lincoln, changing his diaper, cleaning him, and consoling him. Lincoln laughs and smiles at everyone. The foster mother could not tell if Lincoln recognizes his parents, in particular, because he is good-natured and reacts well to everyone. Mother said that she has learned a lot and is now able to raise a child. With her older children, "I didn't really care because I didn't know how to." She wants to be a person her children can respect and a good parent.

DCFS observed that Mother is very motivated to regain custody of Lincoln and began participating in a drug treatment program without the juvenile court ordering her to do so, although one of the conditions of her criminal probation is completion of a six-month drug program. Her visits are of high quality. Despite Mother's efforts, she has used drugs since age 13, going so far as to smoke and inject meth. She has participated in drug programs before, only to return to drug use. In 2002, Mother was discharged from a drug treatment program for threatening another resident; before her discharge Mother was doing well, with perfect attendance and negative drug tests. Mother enrolled in another program from which she was discharged in 2003 for again threatening another resident. Mother enrolled in a third program but left after three weeks. Afterward, she told her a DCFS caseworker, she started using heroin. Mother completed a drug program while incarcerated in 2004-2005.

After completing the prison program, Mother remained sober for five years (perhaps explaining the gap in her arrest records), then began using meth in 2010. Mother used drugs several times a week because she did not have the money to use daily. She has mental problems arising from a traumatic childhood, including being born addicted to heroin, and was abused, neglected and abandoned by her drug-addicted

9

parents. Mother makes inconsistent statements about her drug use. Although she now denies ever using heroin, Mother told an DCFS investigator in 2002 that she smoked heroin, and told a social worker in 2003 that she had starting using heroin "again." Mother's risk of relapse is high, given her history and her willingness to use drugs while pregnant. Mother continued to participate in counseling, parent education, anger management classes, and drug testing.

The court conducted a combined hearing on February 13, 2013. It first addressed Mother's petition for modification. Mother's drug and alcohol counselor acknowledged that Mother "made a huge mistake in her past. I know that she has a past with drug abuse. However, I believe that she has changed. And I believe that she can maintain sobriety" because she has a circle of sober friends, has a sponsor, and attends group meetings four times a week, sometimes twice a day. Mother tests weekly and all the results since October 24 have been negative. Mother will complete the program in April, but asked for six to nine months more. The drug counselor believes Mother is motivated to persevere, be a good mother, and live a drug-free lifestyle. The counselor is not a licensed therapist. Though Mother did not mention it to her, the counselor was aware that Mother tested positive for meth when she gave birth to Lincoln, and has used marijuana, alcohol and heroin during her lifetime.

Mother argued that she has changed for the better, and it would be in Lincoln's best interests to reunify because they have formed a bond during six months of consistent visits. DCFS responded that Mother "has been down this road before many times," losing her children in the process, and using drugs while pregnant. The court observed that Mother has completed numerous drug treatment programs and is currently in an outpatient program, essentially testing clean for the duration. The court found that "there are changing circumstances, and that mother has made progress and has taken steps toward sobriety. However, the evidence before the court indicates that the mother has in the past completed an inpatient program, that she, in fact, was clean for five years and then she relapsed, including taking drugs during the time that she was pregnant with this child, who is at issue today." It would not be in Lincoln's best interest to grant the

10

petition because Lincoln has spent his life in foster care with a family that is offering him a permanent home.

The court heard Father's testimony with respect to the permanent placement plan. He stated that he has visited Lincoln weekly since the petition was filed, monitored by the foster parents. Lincoln recognizes and responds to Father, smiling and reaching for Father. Father feels a bond between them. Lincoln would benefit from continuing the relationship because "I'm his father" and he can teach the child many things, including how to speak Spanish. The prospective adoptive parents stated that they would allow Father to visit Lincoln after the adoption.

Mother testified that she has visited Lincoln once per week since birth. Initially, the visits were one hour, while she was at the inpatient drug program; after completing the program, Mother's visits extended to two hours. While Lincoln was an infant, she would feed and sing to him, and change his diaper. She brings age-appropriate toys for him and encourages him to crawl and move. Lincoln reacts positively when he sees her, and he would benefit from continuing the relationship. Their visits are monitored. The W. family is open to visits following adoption.

Lincoln's attorney joined with DCFS and asked the court to terminate parental rights. The court found that Lincoln is adoptable and it would be detrimental to return him to his parents. The parents have regularly visited Lincoln since his detention, availing themselves of monitored visitation. Balancing their continuing relationship against the security of a permanent adoptive home, the court found that Lincoln has been in foster care since he was five days old. When Lincoln was initially placed, he was suffering the effects of meth, and was restless, tortured, and twitching. The foster parents sought hospital instructions on how to care for an addicted child and help him progress. The twitching and jitteriness stopped at the age of four months. Neither Mother nor Father testified that they sought instructions for caring for a meth-addicted infant. They failed to carry their burden of proving the parent-child relationship exception to the law favoring adoption and permanency. The court terminated parental rights and identified the permanent plan as adoption with the foster parents. Mother appeals.

11

**DISCUSSION**

**1. <u>Denial of Mother's Petition for a Modification</u>**

When the court denies or terminates reunification services, this "ordinarily constitutes a sufficient basis for terminating parental rights." (*In re K.C.* (2011) 52 Cal.4th 231, 236-237.) A parent may revive the reunification issue only by demonstrating changed circumstances. (§ 388; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235; *Kimberly H. v. Superior Court* (2000) 83 Cal.App.4th 67, 72; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) There must be a genuine change in circumstances such that the child's best interests will be promoted by the proposed change in order. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250; *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1071.) To make this determination, the court may consider the entire factual and procedural history of the case. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258; *In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) The ruling cannot be reversed unless there is a clear abuse of discretion—an arbitrary, capricious or patently absurd determination that exceeds the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

     *a. <u>Changed Circumstances</u>*

Mother argues that she established changed circumstances by completing an inpatient drug treatment program, 12 weeks of domestic violence classes, and an anger management course. She was participating in an outpatient aftercare drug program designed for individuals suffering from concurrent drug/mental illness disorders. Further, she regularly visited Lincoln. The record supports Mother's argument that she participated in rehabilitation programs and classes. But the record does not support a conclusion that circumstances have changed.

Mother previously participated in drug rehabilitation without success. In 2002, she abandoned her daughters at a day care center to participate in a drug program, then relapsed. She completed a drug program in 2004-2005, while in prison, then relapsed. She has drug-related convictions in 1996, 2003, 2004, 2010 and 2011.

12

The most compelling measure of Mother's lack of success is the unavoidable fact that Lincoln was born with meth in his bloodstream. Despite her awareness of the dangers of drug abuse, Mother used meth during her pregnancy. She initially told DCFS that she used meth two *weeks* before Lincoln's birth. Later, she told DCFS that she used the drug only once since 2005, two *days* before Lincoln's birth.[2] It is unclear how much Mother really used, and it remains to be seen whether Lincoln will suffer impairment arising from his prenatal exposure to Mother's selfish and heedless drug use. The juvenile court could reasonably find that Mother's eight months of sobriety was minimal progress for someone who describes herself as an addict and has abused drugs since the age of 13, sometimes on a daily basis.

Apart from exposing Lincoln to a dangerous drug before he was born, Mother did not state that she is currently able to provide Lincoln with a stable, safe, permanent home. Without a showing of parental ability to provide a safe home for the child, an 11th hour attempt to extend the dependency proceeding is unavailing. (*In re A.S.*, *supra*, 180 Cal.App.4th at p. 358.)

Merely participating and completing drug counseling and testing, and regularly visiting the child, is not prima facie evidence of changed circumstances. (*In re Anthony W.*, *supra*, 87 Cal.App.4th at p. 251.) Although Mother stresses that she became involved in drug treatment "on her own initiative," there is evidence in the record that Mother is required by the terms of her criminal probation to complete a six-month drug program. Mother's initiative looks less voluntary in view of the criminal court mandate. The dependency court was not satisfied that the problems leading to the dependency

---

[2]    In this proceeding, Mother told the caseworker that she never used heroin; however, during the 2002 dependency proceeding, she told two DCFS employees that she used heroin. She also lied to Father when Lincoln was born, telling him that "the hospital made a mistake and that she did not use drugs." Though Mother initially claimed sobriety for seven years between 2005 and 2012, she has drug arrests and convictions in 2011. Mother has little credibility.

proceeding have been fully resolved. A showing of "changing" circumstances was not enough. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.)

     b. *Best Interests of the Child*

In determining a child's best interest, the court considers (1) the seriousness of the reason for dependency jurisdiction; (2) the strength of the bonds between the child, the parent and the caretakers; and (3) whether the problems leading to dependency may be easily removed or ameliorated. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.)

Given Mother's history in the dependency courts resulting in the termination of parental rights as to one child, and her permanent loss of custody of another child, Mother had a long way to go to prove parental fitness. She argues that the current focus on her history is "misplaced." Considering that Mother knowingly exposed Lincoln to a toxic drug just days before his birth last year—at the risk of destroying his life and health—Mother's history of drug use is highly relevant to any discussion of her parental fitness and the child's best interests.

In this instance, Mother has not progressed to unmonitored visitation with Lincoln, let alone demonstrated an ability to take custody. There is no evidence that Lincoln showed separation anxiety when visits with Mother were over, which tends to discount the strength of the maternal bond. By contrast, he is strongly bonded to his foster parents, where he has spent his entire life. Lincoln was removed from Mother's custody because she has long term substance abuse problems, and any periods of sobriety were achieved only as a result of DCFS or criminal court intervention: "When that support was no longer available, the mother quickly relapsed." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1228.)

The gravity of the circumstances that led to this dependency proceeding cannot be understated. For Mother, what occurred in the past was a prologue to the present proceedings. After permanently losing custody to two children due to domestic violence and drug abuse, Mother used drugs while pregnant with Lincoln.

It is not feasible to ameliorate the conditions leading to the dependency proceeding. Mother did not even admit that she committed a grievous wrong by

14

exposing Lincoln to meth. On the eve of the permanent placement hearing, Lincoln's interest in permanency and stability outweighs Mother's interest in reunification. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309; *In re Anthony W.*, *supra*, 87 Cal.App.4th at pp. 251-252.) The court properly denied Mother's petition for a modification.

## 2. Termination of Parental Rights

At the selection and implementation hearing, the court must select adoption as the permanent plan and terminate parental rights if it finds that the child is likely to be adopted. (§ 366.26, subd. (c)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 49; *In re Jamie R.* (2001) 90 Cal.App.4th 766, 773.) Adoption is the plan preferred by the Legislature. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826; *In re Ronell A.* (1995) 44 Cal.App.4th 1352, 1368.)[3] A parent may avoid termination of parental rights by showing why a statutory exception applies, and that termination would be detrimental to the child. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.) *In re Derek W.*, *supra*, 73 Cal.App.4th at p. 826; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)

Mother argues that her parental rights should not be terminated because she has "maintained regular visitation and contact" with Lincoln, and there is a "compelling reason" to believe that ending the parental relationship would be detrimental to the child. (§ 366.26, subd. (c)(1)(B).) She bears the burden of proving that Lincoln would be "greatly" harmed by termination of parental rights, and that she holds a "parental" role with the child. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853; *In re Angel B.* (2002) 97 Cal.App.4th 454, 466-468.)

Mother must show both prongs of the exception: regular visitation and a benefit to the child if the relationship were continued that outweighs the well-being the child would gain in a new home with adoptive parents. As to the first prong, Mother's visits have been consistent throughout. As to the second prong, the dependency court determined that Lincoln's relationship with Mother is not so significant that he would be greatly

---

[3] Mother does not dispute that Lincoln is likely to be adopted. At least two families are eager to adopt him.

harmed if it were severed. The court's determination is supported by substantial evidence. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

This dependency case began when Lincoln was born. He was detained at the hospital because he and Mother tested positive for meth. As a result of Mother's history of drug abuse and domestic violence, she was unable to have unmonitored, weekend or extended visits, let alone custody of Lincoln. A showing that a child would be greatly harmed by termination of parental rights is difficult to make when, as here, "the parents have . . . [not] advanced beyond supervised visitation." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) A true parental relationship would not require a third party to monitor parent-child visits.

Mother argues that she has consistently visited Lincoln, and the visits were positive and appropriate. Even frequent and loving contact between parent and child is not sufficient to establish the requisite benefit to the child if Mother does not occupy a parental role and is unable to take custody. (*In re Teneka W.* (1995) 37 Cal.App.4th 721, 728; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109.) While Lincoln is bonding with his prospective adoptive parents, Mother has not progressed to the point where she can have unmonitored or overnight visits, even if the visits are enjoyable. A relationship that is "pleasant" is not enough to establish a benefit to the child because "it bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Apart from the incidental benefit of parent-child interaction, we must consider "the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) Lincoln has never lived with Mother: he went directly from the

hospital to foster care. Lincoln only knows Mother from weekly visits. Mother does not occupy a parental role for her child.

Mother does not dispute that Lincoln is thriving in his placement, despite being exposed in utero to meth and suffering from drug withdrawal symptoms for the first four months of his life. Mother did not carry her burden of showing that Lincoln would be greatly harmed by the termination of her parental rights, or that the benefits of continuing their relationship outweigh the benefits of a stable, permanent home. The juvenile court could reasonably find that Mother's relationship is not sufficiently beneficial. In a guardianship or continued foster care, Lincoln would have an unstable placement. Where, as here, a child is likely to be adopted, the court must choose "the most permanent and secure alternative that can be afforded." (*In re Beatrice M.*, *supra*, 29 Cal.App.4th at p. 1419.)

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

BOREN, P.J.

We concur:

ASHMANN-GERST, J.

FERNS, J.*

_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17